UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x     Case No.: 11-cv-0962 (NRB) – ECF CASE
COOPERHILL INVESTMENTS LIMITED,
and KAZOU BV,

                                    Plaintiffs,
                                                                              COMPLAINT

                  - against -

REPUBLIC OF SEYCHELLES, FINANCIAL
INTELLIGENCE UNIT OF SEYCHELLES,
LIAM HOGAN, BARRY GALVIN, DECLAN
BARBER, BARCLAYS BANK (SEYCHELLES)
LTD., BARCLAYS BANK PLC, JOE CULLY
(A/K/A FIU AGENT 007), BMI BANK, and
BMI OFFSHORE BANK (SEYCHELLES),

                                    Defendants.
-------------------------------------------------------------x

           Plaintiffs Cooperhill Investments Limited and Kazou BV, by their attorneys

Hofheimer Gartlir & Gross, LLP complaining of the defendants respectfully allege that:

**Seychelles Continues its Course of Financial Piracy**

           This is the latest case of state-sponsored international piracy.  As noted in two

previous lawsuits filed in this Court, rather than trolling the world's oceans for prey, the

Seychelles government, in cooperation and conspiracy with Barclays Bank -- and now

BMI Bank of Bahrain -- has commandeered the world's financial system and ransacked

the bank accounts of legitimate businesses and law abiding citizens.

           The Seychelles Financial Intelligence Unit (the "FIU"), rather than brandish

machine guns or grenade launchers has, by offering significant compensation, lured

former Irish Gardai and former members of a secret Irish military unit to act as its

"mercenaries."  These former Irish Gardai (Defendants Galvin, and Hogan), and former

members of a secret Irish military unit (Defendants Barber and Cully), appear all too

eager to disregard due process, engage in perjury, suborn perjury, encourage false official statements, and run amuck.  These Irish Subcontractors engage in these activities with little or no conscience as to the damage that they are causing their victims -- and with no foresight as to the crippling blow they are dealing to the reputation of the Seychelles banking industry.  They have gone so far that the plaintiffs in one of the previous lawsuits alleged that the FIU and its Irish Subcontractors kidnapped the plaintiffs and held them for ransom.

Unfortunately, Plaintiffs here also have fallen victim to this rapacity.  As with other businesses and individuals, they had the misfortune of depositing money into Barclays and BMI bank accounts in Seychelles, where the funds were subject to theft by Seychelles and the FIU -- with assistance from these two banks.

## **INTRODUCTION**

1.      Plaintiffs are both legitimate small businesses.  Cooperhill Investments Limited ("Cooperhill") is an international trading platform with hundreds of clients from around the world.  In or around December 2008, Cooperhill opened bank accounts at BMI Offshore Bank (Seychelles) ("BMI Seychelles") in order to hold and manage some of its clients' investments.  Cooperhill then opened sub-accounts for the clients.  The funds that are held in the BMI Seychelles accounts belong to Cooperhill's clients, not Cooperhill.  BMI Seychelles is partially owned by the Republic of Seychelles.

2.      The FIU and Republic of Seychelles misappropriated funds from several of Cooperhill's BMI Seychelles accounts (the "BMI Accounts") that contained in total approximately $3,662,000 in United States dollars, €3,736,000 in euros, and £689,000 in British pounds sterling.  If converted to all United States dollars, the funds would be approximately $10,300,000.

3.      Kazou BV ("Kazou") is an international business company that specializes in the energy efficiency industry.  Kazou operates mainly in Spain, Germany, the Netherlands, France, the United Kingdom, Finland, Austria and Hungary.  Kazou opened accounts at Barclays Bank (Seychelles) Limited ("Barclays Seychelles") in order to handle its business enterprise.

4.      The FIU and Republic of Seychelles misappropriated funds from several of Kazou's Barclays (Seychelles) accounts (the "Barclays Accounts") that together contained in total approximately $18,000 in U.S. dollars, €71,000 in euros, and £201,000 in British Pounds Sterling.  If converted to all United States dollars, the funds would be approximately $426,000.

5.      The Financial Intelligence Unit (the "FIU"), an agency and instrumentality of Seychelles, with help from Barclays and BMI, stole these funds of Cooperhill and Kazou for the ultimate benefit of Seychelles.  Barclays and BMI identified the bank accounts of Cooperhill and Kazou as targets for financial piracy by the FIU.  The FIU then simply took over the bank accounts without giving any word or reason to either Cooperhill or Kazou, and have now expropriated the funds contained in these accounts.  The FIU stole Cooperhill's BMI Accounts on or about March 17, 2010.  The FIU stole Kazou's Barclays Accounts in or about September to December 2009.

6.      The FIU stole the funds quietly.  One reason for the FIU's stealth is because the FIU had devised a plan to steal more money than the BMI Accounts typically held.  The FIU froze the BMI Accounts while allowing deposits to continue for several days, in order to grow the funds in the accounts and increase the FIU's plunder.  Cooperhill held the BMI Accounts as escrow accounts for Cooperhill's clients.  The

accounts, therefore, did not typically accumulate large amounts of funds.  Instead, as Cooperhill's clients made investments, money would move in an out of the accounts on a daily basis.  But when the FIU froze the accounts -- so that no money could be withdrawn or transferred -- the FIU purposely allowed the deposits to continue.  As a result, the funds grew at a drastic pace.  Using this devious scheme, the FIU was able to steal a much larger amount of funds from Cooperhill than it otherwise would have been able to pilfer.  Barclays agreed to assist the FIU in this scheme.

7.      The FIU has since remained silent about the reason that it confiscated the funds in these bank accounts although Cooperhill and Kazou, through their attorneys, have asked why the companies may no longer access the money in the accounts.  The FIU has stolen the funds without any legal basis.

8.      The FIU has subcontracted its operations to Irish nationals.  Defendant Liam Hogan is a former member of the An Garda Siochana (the "Gardai"), the Irish national police force, and worked for part of his time in the Special Branch (the Irish secret police).  Defendant Barry Galvin was employed by the Criminal Assets Bureau of the Gardai and also worked with the Special Branch.  Defendants Declan Barber and Joe Cully are former members of a secret Irish military unit.  Barber is now Irish Honorary Counsel to Seychelles.  Collectively, Messrs. Hogan, Galvin, Barber, and Cully will be referred to herein as the "Irish Subcontractors."  Mr. Galvin, who is in the private practice of law in Cork, Ireland, is de facto head of the FIU.  Mr. Barber is the FIU Director and Mr. Hogan is the FIU Deputy Director.  These Irish Subcontractors of the FIU receive compensation many times higher than government employees of Seychelles (which has apparently caused significant resentment and discontent among the ranks, causing several

senior officials of Seychelles to resign), and seek to establish their value by maximizing the amount of funds that they seize.  Upon information and belief, the Irish nationals who work for the FIU have all received commissions based upon the seizures.

9.      Seychelles is a tiny nation located almost 1,000 miles off the east coast of Africa.  Seychelles was in an acute financial crisis in 2008, from which it has not yet emerged.  It required assistance from, inter alia, the International Monetary Fund (the "IMF") and the African Development Bank to save it from the brink of economic disaster.  Seychelles has been engaged in renegotiating its foreign debt, which it has been unable to pay.  Its foreign reserves are depleted.  Even with assistance from many different international organizations such as the IMF and the African Development Bank -- which guaranteed a recent Seychelles bond issue -- Seychelles continues its nefarious activities of stealing from foreigners who have made the regrettable mistake of banking in Seychelles.

10.      Although Seychelles has promoted itself in the United States and throughout the world as an offshore financial center, it has embarked on a misguided scheme to seek economic recovery by stealing funds belonging to citizens of other countries.  It appears to have made a policy decision to poison itself as an offshore finance center -- since no rational person or business outside Seychelles could possibly keep funds there any more -- for the short-term benefit of misappropriating available funds.  Apparently in a panic to obtain foreign reserves and meet IMF benchmarks, Seychelles has made the decision to seize what funds are available and engage in commercial piracy.  This conduct is consistent with findings of the U.S. State Department that Seychelles officials sometimes engaged in corrupt practices with impunity.

11.     The Seychelles press has alleged that these Irish subcontractors also receive commissions based on the amount of funds that they seize.  Based upon this allegation in the Seychelles press, the Irish Subcontractors are engaged in the private enterprise of earning commissions for themselves through financial piracy, fraud, extortion, kidnapping, false arrest and ransom, among other activities.  These Irish Subcontractors and the FIU do not care whether the funds that they seek to seize are legitimate or not -- they simply desire to increase the amounts taken.  These rogue subcontractors, with no background in banking and financial matters, are using alleged enforcement of anti-money laundering laws to enrich themselves.

12.     The irregularities in the Seychelles judicial system are well illustrated in a February 10, 2009 United States Department of State report entitled "2008 Country Reports on Human Rights Practices - Seychelles."  In that article, the Department of State says of the Seychelles judicial system that "the judiciary was ineffective and subject to executive influence.  Both civil and criminal court cases generally lasted years ...."

13.     Moreover, as well laid out in media accounts and in two civil complaints filed in this court, three people traveled to Seychelles in 2009 in order to inquire about funds that, according to the media and complaints, the FIU stole in the same manner it has here.  Of those three people, according to the media and complaints, one was threatened -- along with his attorneys -- with arrest and confinement, and the other two were kidnapped and held hostage for over three months until they agreed to pay ransom to the FIU and Seychelles.  Plaintiffs can have no expectations of fair legal proceedings in Seychelles; nor may they safely travel to Seychelles in order to avail themselves of the Seychelles Court System that the U.S. State Department has found to be corrupt.

6

14.     Cooperhill has had no other choice but to reimburse many of its clients for the funds that the FIU stole.  Cooperhill has made these reimbursements with its own funds, placing tremendous stress on the company and undermining its ability to perform its business activities on behalf of its clients.

15.     Kazou has found it increasingly difficult to conduct its business without the funds that the FIU stole.  Kazou's business requires that Kazou possess the cash that the FIU now holds.

16.     Although Barclays and BMI knew that the FIU intended to seize the funds in Plaintiffs' Barclays and BMI Accounts, they hid this information from Plaintiffs.  It is apparent that Barclays and BMI determined to conspire with Seychelles authorities to assist them in the seizure of Plaintiffs' funds.

17.     The Seychelles press has accused Barclays of being completely subservient to the FIU and of failing to protect the legitimate interests of its own customers.

18.     The expropriation of Plaintiffs' funds without due process is a violation of the law of nations.  Seychelles and the FIU engaged in a course of seizing and expropriating property for the private purpose of outright theft -- which is not a governmental function -- in a discriminatory fashion against non-Seychelles nationals and without providing for the payment of fair compensation.  Seychelles has no adequate forum for Plaintiffs to adjudicate their rights to their own funds.

**JURISDICTION AND VENUE**

19.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1330, 1608 and 1350.  Supplemental jurisdiction exists over the remaining state law claims, pursuant to 28 U.S.C. § 1367(a).

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c), 1391(f)(1) and 1391(f)(3) by reason of  certain defendants doing business here and some of the property that is the object of the action having been transferred though this District.

**THE PARTIES**

21.     Plaintiff Cooperhill Investments Limited is an international business company formed under the laws of Samoa on August 2, 2007.  Its registered office is located in Apia, Samoa.

22.     Plaintiff Kazou BV is an international business company incorporated and registered under the laws of the Republic of Seychelles on July 8, 2009.  Its registered office is located in Mahe, Seychelles.  Kazou also maintains an office in Manchester, England.

23.     Defendant Republic of Seychelles is an archipelago nation located almost 1,000 miles east of Africa.  The entire population of the country, as of July 1, 2009, was estimated to be 87,476.  The capital of Seychelles is located in Victoria, Mahe, Seychelles.

24.     Defendant the Financial Intelligence Unit ("FIU") is an agency and instrumentality of Seychelles.  Upon information and belief, the FIU's principal place of business is in either Seychelles or Ireland.  The FIU has done business in the City, Country and State of New York.

25.     Defendant Liam Hogan ("Hogan") is a subcontractor working on behalf of the FIU.  In this capacity, Hogan carries the title Deputy Director of the FIU.  Upon information and belief, defendant Hogan is a citizen and resident of Ireland.

26.     Defendant Barry Galvin ("Galvin") is a subcontractor working on behalf of the FIU.  Galvin acts as a private consultant to the Seychelles government.  Upon information and belief, defendant Galvin is a citizen and resident of Ireland and engages in the private practice of law in Cork, Ireland.

27.     Defendant Declan Barber ("Barber") is a subcontractor working on behalf of the FIU.  In this capacity, Barber carries the title Director of the FIU.  Upon information and belief, defendant Barber is a citizen and resident of Ireland.

28.     Defendant Joe Cully ("Cully") is a subcontractor working on behalf of the FIU.  In this capacity, Cully carries the title of NDEA Agent 007 attached to the FIU.  Upon information and belief, Cully is a citizen and resident of Ireland.

29.     Defendants Seychelles, the FIU, Hogan, Barber, Galvin, and Cully will, at times, be collectively referred to as the "Seychelles Affiliated Defendants."

30.     Defendant Barclays Bank (Seychelles) Ltd. is a banking institution located in Victoria, Mahe, Seychelles.  Upon information and belief, it is a subsidiary of Barclays Bank PLC and organized under the laws of Seychelles.  Upon information and belief, Barclays Seychelles is dominated and controlled by Barclays Bank, PLC, which makes all material decisions for Barclays Seychelles.  On its website, Barclays Bank PLC holds out its operations in Seychelles as being part of its global operations.  Barclays Bank (Seychelles) Ltd. does not hold itself out as a separate legal entity from Barclays Bank PLC.

31.     Defendant Barclays Bank PLC is a banking institution, registered in England and Wales, United Kingdom, and is authorized and regulated by the Financial Services Authority.  Barclays Bank PLC is a subsidiary and/or member of the Barclays Group and has a large presence in the United States and, in particular, in New York, New York where its wire transfers of U.S. dollars are cleared.  Barclays Bank PLC does business in New York, New York.

32.     Collectively, Barclays Bank (Seychelles) and Barclays Bank PLC will be referred to as the "Barclays Defendants" or "Barclays."

33.     Defendant BMI Offshore Bank (Seychelles) is a banking institution located in Victoria, Mahe, Seychelles.  It is organized under the laws of Seychelles and is a branch of BMI Bank, of Bahrain according to that entity's website.  Upon information and belief, BMI Offshore Bank (Seychelles) is owned 50% by BMI Bank, of Bahrain, and 50% by Nouvobanq, of Seychelles.  Both of these shareholders are represented on the BMI Offshore Bank (Seychelles) board of directors.  On its website, BMI Bank holds out its operations in Seychelles as being a branch of BMI  Bank and part of its global operations.  BMI Offshore Bank (Seychelles) does not hold itself out as a separate legal entity from BMI Bank.

34.     Defendant BMI Bank is a banking institution located in the United Arab Emerate Bahrain.  Upon information and belief, it is organized under the laws of Bahrain.  Upon information and belief, BMI Bank has the mandate to manage the operations of BMI Offshore Bank (Seychelles).  Upon information and belief, BMI Bank shareholders include Bank of Muscat in Oman, Royal Court Affairs in Oman, Overseas Investment in Bahrain, Istithmar World in Dubai, Global Investment House in Kuwait, and Financial

Assets Bahrain in Bahrain.  Upon information and belief, BMI Bank operates in Bahrain and Qatar and holds a 21% stake in Gulf African Bank in Kenya.

35.      Collectively, BMI Offshore Bank (Seychelles) and BMI Bank will be referred to as ("BMI").

36.      Nouvobanq (Seychelles International Mercantile Banking Corporation) ("Nouvobanq") is a banking institution located in Victoria, Mahe, Seychelles.  Upon information and belief, it is organized under the laws of Seychelles.  Upon information and belief, Nouvobanq is owned 78% by Defendant Republic of Seychelles and 22% by Standard Chartered Bank.

37.      Standard Chartered Bank is one of the world's largest banking institutions. Standard Chartered Bank has a large presence in the United States and, in particular, in New York, New York where its wire transfers of U.S. dollars are cleared.

## FACTUAL BACKGROUND

A.      <u>Background of Cooperhill and BMI Seychelles.</u>

38.      Cooperhill was referred to BMI by Frank Horeau who was a Barclays Seychelles who was a Barclays Seychelles employee and worked with Cooperhill on its Barclays Seychelles account.  In or about 2007 or 2008, Mr. Horeau left Barclays Seychelles and began working at BMI Seychelles.  He later convinced Cooperhill to move its accounts from Barclays Seychelles to BMI Seychelles.  This transfer was completed on December 31, 2008.  Upon information and belief, at this time Mr. Horeau held the title of General Manager at BMI Seychelles.  Upon information and belief, Mr. Horeau now is managing director for BMI Seychelles.

39.     Cooperhill opened the BMI Accounts as escrow accounts for more than 150 of its clients.  Funds from the accounts were invested on behalf of Cooperhill clients.  Any client profits would flow back into the escrow account for either reinvestment or payment to the clients.

B.     The FIU Seizes the BMI Accounts.

40.     Upon information and belief, without Cooperhill's knowledge, BMI, working together with the FIU, on March 17, 2009, froze the BMI Accounts, and the FIU then issued a directive to BMI to seize the funds in the BMI Accounts.  At the same time, the FIU and BMI allowed funds to continue to be deposited and/or otherwise flow into the BMI Accounts for several days after the FIU and BMI froze the accounts, thus growing the amount of funds in the accounts.  Plaintiffs in a previous lawsuit filed in this District alleged that the FIU had used this very same devious scheme to grow the funds that the FIU had stolen from those plaintiffs.  Xiao, et al. v. Republic of Seychelles, et al., S.D.N.Y. Case No. 09-CV-09845.  The Xiao case is discussed in more detail below.

41.     Neither Barclays nor the FIU notified Cooperhill that the BMI Accounts had been frozen.  To date, neither Barclays nor the FIU has provided Cooperhill with a copy of the FIU's directive to seize the accounts and any funds contained in it.

42.     Once Cooperhill realized that it could not access the funds in its accounts, it contacted Horeau at BMI.  Horeau told Cooperhill's representatives that he was not allowed to discuss the situation and instead referred Cooperhill to the FIU.  According to Horeau, Defendant Hogan was in charge of taking Cooperhill's funds.

43.     In March 2010 Cooperhill's representatives called to speak with Hogan about the BMI Accounts.  Hogan refused to give them any information.

44.     On April 13, 2010, an attorney representing Cooperhill sent a letter to Horeau at BMI.  Horeau strung the attorney along.  On the same day, Horeau sought confirmation, via Email, of the attorney's identity and that he had authority to represent Coopherhill.  The attorney immediately sent Horeau a power of attorney showing that he had authority to represent Cooperhill.  Only when the attorney called Horeau on the same day did Horeau tell him that Horeau was not allowed to discuss Cooperhill's accounts.  Horeau then told the attorney that Defendant Scully at the FIU was the person to contact about the accounts.

45.     Cooperhill's attorney called Scully by telephone on April 15, 2010.  Scully told the attorney that he needed to prepare the case and would call the attorney back.  Scully was stalling.  He never called the attorney back.  In fact, Scully did not respond to the attorney's attempts to contact Scully and was otherwise unreachable for two months.

46.     Finally, on June 17, 2010, the attorney again spoke with Scully by telephone.  Stalling again, Scully refused to discuss the case until the attorney sent him the original power of attorney that showed the attorney had authority to represent Cooperhill.  The attorney sent the original documentation via DHL on June 17, 2010.  The attorney later received proof that the DHL package was delivered to Scully.  But Scully never returned this call.  Scully has since refused to respond to the attorney's attempts to speak with him and has made himself unreachable to the attorney.  Neither Cooperhill nor its attorney ever heard from the FIU again.  The FIU has simply stolen the funds and refuses to talk to anyone about them.

47.    Neither Horeau nor Scully or Hogan has ever given Cooperhill, any of its representatives or its attorney any reason why the FIU has stolen Cooperhill's funds.

C.    <u>Background of Kazou and the Barclays Account.</u>

48.    Kazou opened its Barclays Seychelles euro account on or about April 8, 2009.  Kazou opened its United States dollars and British pounds sterling accounts on July 9, 2009.  Chantal Hoffman of Fidelity Corporate Services (Seychelles) Limited assisted Kazou in opening the initial account.  Once that account was opened, Selby Remy of Barclays Seychelles was assigned to the account as the relationship manager.  He later took that role with respect to Kazou's other two Barclays Seychelles accounts.

49.    Remy was also allegedly a prominent player in the <u>Xiao</u> stolen-account lawsuit.  Upon information and belief, Barclays conspired with the FIU to steal any money deposited into Kazou's Barclays Seychelles account while Kazou was in the process of opening the account.

50.    In <u>Xiao</u>, plaintiffs alleged that Remy, a Barclays employee, conspired with the FIU to help steal plaintiffs' funds and that he stalled in order to help the FIU accomplish that task.  Here, Remy again stalled.  After the accounts were opened and fully operational, Kazou transferred money into it -- which Barclays had told Ms. Hoffman was required in order to activate the account.  On August 5, 2009, the day that Kazou received a letter from Barclays Seychelles that said the initial Barclays Account was opened, Kazou asked Remy via Email when Kazou could have access to those funds.  Remy said that the paperwork was not complete -- even though the account had already been opened.  In Emails dated August 5, 2009 and August 6, 2009, Remy said that the process would last about 10 days.

51.     Other Barclays Seychelles employees also took part in the scheme.  For example, on September 4, 2009, a Kazou representative requested help from Christine Alphonse, an "Electronic Banking Services SAS Administrator," on how to make a same-day SWIFT transfer from Kazou's Barclays Seychelles accounts.  Alphonse told the representative that Kazou could not make same-day SWIFT transfers from its accounts and asked that Kazou fill out further paperwork.

52.     Kazou completed the forms for a transfer of €500,000 on September 9, 2009.  On the same day, Kazou's representative advised Remy of the transfer request, its amount and the beneficiary of the transfer.  Remy did not respond.

53.     On September 11, 2009, still ignoring Kazou's earlier Email, Remy wrote in an Email:

> Whilst going over your account I notice that you have made a transfer of Euro500,000.  This is not in line with the company information which you provided at account opening.  Can I therefore please have some extra explanation as to the purpose of this transfer.  Can you also please clarify if the profile of your company has also changed.

Remy was continuing to stall at the FIU's direction.

54.     Kazou's representative responded shortly after Remy's Email.  The response explained that the transfer was directly related to Kazou's business activities as described in it its bank application and gave Remy all the details about the transaction.  Kazou's representative also told Remy that the company's profile had not changed.  Remy continued to stall at the FIU's behest.  He asked why the amount was €500,000, not the €250,000 that Kazou had thought its highest transactions would be when Kazou opened the account.  Kazou's representative explained that Kazou had an opportunity to

purchase a higher amount of credits at a good rate and decided that the transaction would

help Kazou maximize growth.

55.     On December 30, 2009, Remy again wrote the Kazou saying

> ...I have noticed that you are transacting in amounts which
> are significantly above what you mentioned you would on
> account opening.  Can you please provide an explanation in
> this regards and also advise us if your company profile has
> changed.

56.     Kazou replied, through its representative that:

> The company profile is unaltered since we opened our
> Business Account, although we continue to strive into new
> areas of business development.  Progress is in the making
> and we hope to have some business expansion hopefully in
> 2010, we will advise you accordingly.

> The volume of business has been slightly above some of
> our expectations thus resulting in larger amounts.  Our
> business par[t]ners are doing brisk trade and therefore
> purchases have been above normal levels.

> I hope this explains your query, if you have any further
> questions please don[']t hesitate to contact me.

57.     Remy responded saying that the explanation will suffice "for now," but

told the representative that Remy still needed more information.  He was continuing to

stall and, upon information and belief, to help the FIU build a case to steal Kazou's

funds.

58.     Remy continued his questioning in a January 28, 2010 Email when he

asked for the purpose of a €605,000 transfer and also "about the source of funds for the

incoming … credited to your account on the 20th Jan."

59.     The next day, in response to a Kazou Email about the forms necessary for

various transfers, Remy wrote:

I will appreciate if you can please provide me with the information I requested yesterday.  Furthermore I will appreciate if you can also provide clarifications about these two additional payments.

Date: 22/12/09

Amount: GBP300000

Date: 14/01/10

Amount: EUR1053579.80

60.     Remy continued to question Kazou's transactions -- both incoming and outgoing.  The requests were increasingly aggressive, even after Kazou's representative told Remy that he had been experiencing health problems.  Remy was stalling because the FIU did not want him to transfer funds out of Kazou's accounts.  The FIU and Barclays had conspired to keep any substantial funds from leaving the account -- even before the account was frozen.

61.     Remy's actions with respect to Kazou's Barclays Accounts are virtually identical to his actions as alleged in the Xiao complaint.

62.     Finally, on April 28, 2010, in response to Kazou's questions about outgoing transfers that Barclays Seychelles did not complete, another Barclays Seychelles representative, Fabiola Horner told Kazou's representative that Kazou's "accounts have been frozen by the FIU and are subject of an investigation."  Horner referred Kazou to the FIU.

D.      The FIU Seizes the Barclays Accounts.

63.     Upon information and belief, without Kazou's knowledge, Barclays, working together with the FIU, already had frozen the Barclays Accounts and the FIU issued a directive to Barclays to seize the funds in the Barclays Account.  Upon

17

information and belief, these actions occurred at some point between September 22, 2009 and December 2009.

64.     The FIU never notified Kazou that the Barclays Accounts had been frozen. Barclays never notified Kazou that the Barclays Accounts had been frozen until after Kazou persisted in its inquiries about transfers that Barclays Seychelles had not completed.  To date, neither Barclays nor the FIU has provided Kazou with a copy of the FIU's directive to seize the accounts and any funds contained in it.

65.     On May 6, 2010, Kazou's attorney wrote to "The Director" of the FIU stating that Kazou had never received any contact or explanation from the FIU as to why it had frozen Kazou's funds.  The attorney requested the details behind and the legal basis for the FIU's actions and also told the FIU that their actions were causing Kazou "significant hardship ...."

66.     In response, Defendant Hogan fax'd Kazou's attorney a simple letter.  It read, in its entirety:

> Receipt of your fax sent on the 6th May is hereby acknowledged.
>
> Please note that the FIU is not in a position to communicate information in any matter to any person other than the account holder, without written authenticated authority in usual form from the person entitled to operate the account by virtue of the mandate in that regard.

67.     Hogan did not say what he meant by "written authenticated authority in usual form ...."  But Kazou's attorney interpreted Hogan's request as being for a power of attorney.  So on May 19, 2010, the attorney forwarded to Hogan a duly executed and notarized power of attorney allowing the attorney to act on Kazou's behalf.

68.     Persisting in his obstructionist behavior, Hogan fax'd back another short letter that read:

> You are referred to previous correspondence.  Please note that the documentation sent is insufficient.  What was meant by the "usual documentation" was a detailed notarized authority accompanied by an appropriate apostile.  You might please arrange accordingly.

69.     Neither Kazou nor its attorney ever heard from Hogan or the FIU again. The FIU has simply stolen the funds and refuse to speak with anyone about them.

70.     Neither Remy nor Hogan has ever given Kazou, any of its representatives or its attorney any reason why the FIU has stolen Kazou's funds.

E.     The Irish Subcontractors Run the Money-Stealing
       Scam on Behalf of the Republic of Seychelles.

71.     The FIU is operated and controlled by citizens of Ireland, being defendants Galvin, Hogan, Barber, Cully, among others.  These men are paid greatly in excess of officials of the Seychelles government.  In effect, Seychelles and the FIU have subcontracted anti-money laundering to these Irish Subcontractors.  Upon information and belief, Defendants Hogan and Barber, on behalf of the FIU, issued all directives to, and held all discussions with, BMI and Barclays regarding the BMI and Barclays Accounts.

72.     Upon information and belief, Defendant Galvin directed the FIU's operations regarding the BMI and Barclays Accounts behind the scenes and supervised the actions of Hogan, Barber, and Cully.  Upon information and belief, Hogan acted as the second in command to Galvin and supervised the day-to-day operations of the FIU, its agents and police officers in the FIU's attempts to expropriate the funds of Cooperhill and Kazou.  Upon information and belief, Barber also was heavily involved in these

actions, supervising and giving direction to the FIU and police personnel in their actions to steal the funds in the BMI and Barclays Accounts.  Galvin is an Irish attorney engaged in the private practice of law.  The FIU is thus operated as a private enterprise.

73.     According to an October 8, 2009 article entitled "F.I.U. in Another Incident of Miscarriage of Justice" that appeared in *Le Nouveau Seychelles Weekly*, a local Seychelles newspaper, Barclays "does not have proper assessment mechanisms that can differentiate between a fraudulent and a genuine financial instrument."  As the article states, Barclays has in the past failed to perform even "the simplest of duties: external verification or what is commonly known as verification at source."

74.     According to the article, the actions of Barclays and the FIU show "incompetence, a lack of understanding of banking procedure and protocol and extreme arrogance and impunity in the application of the law."

75.     Seychelles, the FIU, and the Irish Subcontractors expropriated the funds to benefit Seychelles' own coffers as part of an attempt to pull Seychelles out of its financial woes.  This unlawful tactic is not specific to Cooperhill and Kazou.  In fact, beginning in late 2008 or early 2009, the Seychelles Affiliated Defendants developed a pattern of seizing funds from bank accounts held by other foreign individuals and companies.  By August 2009, the Seychelles Affiliated Defendants already had seized more than 100 bank accounts.  This rate of seizure was by far the greatest in Seychelles history of so-called anti-money-laundering enforcement.

> F.     This Incident of Financial Piracy is Not an
> Isolated Incident -- Instead, it is a Course of
> <u>Behavior Adopted by the Republic of Seychelles.</u>

76.     These actions by Barclays, BMI and the FIU are not part of an isolated incident.  Instead, they are part of a common scheme by Barclays -- and now BMI -- and

the FIU to work together, to target bank accounts owned by foreign individuals and companies, and to seize the accounts so Seychelles may unlawfully expropriate the funds.

77.     In one case similar to this one, a United States businessman also alleged that Seychelles committed "financial piracy."  That case, the <u>Xiao</u> case mentioned above, filed in the Southern District of New York, sought to recover more than $8.5 million that the Republic of Seychelles illegally seized from his solar energy company in 2008 and 2009.  As here, the <u>Xiao</u> complaint pleaded that the Seychelles Government had offered no credible explanation or formal justification for its seizure of the assets deposited in a Barclays Seychelles bank account.  Defendants Seychelles, the FIU, Hogan, Galvin, Barber and Barclays were all Defendants in the <u>Xiao</u> action.

78.     As here, the <u>Xiao</u> Complaint alleged that the FIU has subcontracted its operations to Irish nationals.  It pleaded that Hogan and Barber, defendants here, committed perjury on numerous occasions and brazenly and routinely ignored court orders.   According to the <u>Xiao</u> complaint, Barclays conspired with the FIU to expropriate the $8.5 million that was in a Barclays Seychelles account.

79.     Xiao alleged that, in December 2008, he sought to establish a bank account for his company at Barclays Seychelles in order to receive wire transfers from a client in Asia.  According to the complaint, Barclays repeatedly delayed opening the account and failed to provide the necessary account documents and information.

80.     It turned out that at the same time, Barclays was working with the FIU to plan the seizure of the funds, according to the allegations.  When the account was finally opened, the complaint alleges, Barclays and Seychelles officials immediately seized the assets.  As here, the <u>Xiao</u> complaint pleaded that neither Barclays nor the FIU has ever

provided Xiao with a copy of the FIU's formal justification for seizing the company's assets.  As here, the complaint also alleged that Barclays and Seychelles officials in 2009 engaged in a fraudulent scheme to seize additional deposits made by Xiao's company.

81.    In another case similar to this one, two businessmen from Tenerife, Spain also alleged that Seychelles committed "financial piracy."  Scholes, et al. v. Republic of Seychelles, et al., SDNY Case No. 10-CV-03672.  These businessmen pleaded that they had deposited money into a Barclays bank account in Seychelles, where the funds were subject to theft by Seychelles and the FIU -- with assistance from Barclays.

82.    The Plaintiffs in Scholes pleaded that, not only did Seychelles and the FIU steal the funds in the bank account at Barclays, but they also kidnapped the two businessmen when they traveled to Seychelles to discuss the account.  Seychelles and the FIU put these two innocent men in prison for a month based on false charges, held them hostage on the Island of Mahe, Seychelles for an additional two-and-a-half months, and threatened to set them up on false drug and money-laundering charges.

83.    The Scholes plaintiffs alleged that the FIU even made threats to family members of one businessman -- including to his wife, his 14-year-old daughter and regarding custody of his 16-month old baby girl -- who had all traveled to Seychelles with the businessman for vacation.

84.    The Scholes complaint pleaded that the captivity ended only when these Plaintiffs finally agreed to pay the demanded ransom.

85.    The Scholes plaintiffs alleged that they had been the victims of international fraudsters.  According to the Scholes complaint, Barclays conducted an investigation of its own and concluded that the plaintiffs had been tricked by international

criminals into paying $700,000 euros to them. Those plaintiffs pleaded that they had managed to convince the criminals to return the funds, but Seychelles and the FIU seized these funds, in effect blaming Plaintiffs for having been victims of fraud.

86.     The Scholes plaintiffs alleged that even though Barclays recognized that Plaintiffs were in over their heads, it cooperated with Seychelles and the FIU to compel the Scholes plaintiffs to pay a ransom of nearly half the money returned to them by the fraudsters.

87.     As here, the Scholes complaint alleged that the FIU has subcontracted its operations to Irish nationals. The Scholes' complaint also pleaded that an FIU sub-inspector, Joseph Bibi, committed perjury on multiple occasions in order to continue the kidnapping. According to the Scholes complaint, Barclays conspired with the FIU to expropriate approximately $1 million that was in a Barclays Seychelles account and then demanded that those plaintiffs pay ransom from that amount for their freedom.

88.     As here and with Xiao, in Scholes, Barclays was working with the FIU to plan the seizure of the funds, according to the allegations. As here, the Scholes complaint pleaded that neither Barclays nor the FIU has ever provided the Scholes plaintiffs with a copy of the FIU's formal justification for seizing the company's assets.

89.     As here, the Scholes complaint pleaded that the Seychelles Government had offered no credible explanation or formal justification for its seizure of the assets deposited in a Barclays Seychelles bank account. Defendants Seychelles, the FIU, Hogan, Galvin, Barber, Cully, and Barclays were all Defendants in the Scholes action.

G.      As Part of Their Overall Scheme to Defraud and Steal Bank Accounts from Foreigners, the Seychelles Affiliated Defendants Have Stepped into the United States, Gathered So-Called Witnesses and Even Used the United States Court System.

90.     With <u>Xiao</u>, the Seychelles Affiliated Defendants relied upon American law as the basis for attempted theft.  In essence, the Seychelles Affiliated Defendants sought to hijack an arbitration filed with the American Arbitration Association in New York City, and have the civil issues of American law adjudicated in Seychelles.  In that proceeding brought by Xiao, the arbitrators in New York City were to adjudicate the value of the 50% interest of Xiao's deceased partner in their company as of the date his widow had exercised a put right according to the company's operating agreement.  The widow had aggressively and unsuccessfully sought to adjudicate the valuation issues in the Federal District Court for the District of New Jersey and the New Jersey Superior Court.  The Superior Court had stayed the litigation pending arbitration, and held that the arbitration was to determine the valuation of the 50% interest as of the date of the exercise of the put.

91.     The Seychelles Affiliated Defendants attempted to insert themselves into the Xiao proceedings.  The Seychelles Affiliated Defendants wrongly claimed in a Seychelles case against Xiao, that under American law, the widow of the former business partner, as executor of the business partner's Estate, had continued to have an ownership interest in the businessman's solar energy company.  By reason of this interpretation of American law, the Seychelles Affiliated Defendants contended that Xiao had committed an embezzlement under United States law.  They claimed to rely upon the affidavit of a New York attorney, Michael McGovern, and an affidavit of the business partner's widow to sustain their allegations.  By this conduct, the Seychelles Affiliated Defendants sought to supplant an ongoing New York AAA arbitration that would determine the widow's

right, as executor of her husband's estate, to be paid for her interest in the partners' company.

92.     This interference by the Seychelles Affiliated Defendants in American proceedings -- as part of their overall scheme to steal funds from the Seychelles bank accounts of foreigners -- together with their explicit reliance on American law as the alleged basis for their expropriation constituted commercial activity in the State, County and City of New York as well as a waiver of sovereign immunity in relation to their overall scheme.  Having previously sought to justify their conduct based on American law, they cannot now complain about an American tribunal adjudicating issues of American law.  This reliance upon American law as the basis for a confiscation constitutes a waiver of sovereign immunity in relation to their overall scheme.  This overall scheme of the Seychelles Affiliated Defendants to expropriate accounts of foreign citizens, a commercial activity, has taken place in material part in New York City.

93.     In addition, the Seychelles Affiliated Defendants have waived sovereign immunity (i) by appearing in the United States District Court for the Southern District of New York to resist discovery of its New York attorney, Michael McGovern, that the American businessman sought pursuant to 28 U.S.C. § 1782 without having raised any defense of sovereign immunity, (ii) by submitting affidavits for use in that proceeding, and (iii) by committing perjury (in particular, the United States perjury was committed by Defendant Hogan) in furtherance of their commercial activities in the State, County and City of New York and scheme to steal the funds of the American businessman and his solar energy company.  These actions were part of the Seychelles Affiliated Defendants' overall scheme to plunder the funds of foreigners held in Seychelles banks.  The theft

from plaintiffs here was part of the same scheme of theft by the Seychelles Affiliated

Defendants that took place in material part in New York City.  Seychelles, the FIU and its

agents have in the past waived sovereign immunity to litigate in United States courts.

Based on this past practice, Plaintiffs here reasonably expect that Seychelles, the FIU and

its agents will do so again here.  Based on their prior conduct, it is the practice of the

Seychelles Affiliated Defendants to address the substance of proceedings brought against

them regarding expropriation and it is their practice to waive the defense of sovereign

immunity.  When Xiao sued the Seychelles Affiliated Defendants in this Court, they

simply returned his money.

      H.     The Seychelles Affiliated Defendants are
               <u>Engaged in the Private Enterprise of Theft.</u>

      94.     In the guise of anti-money-laundering enforcement, the Seychelles

Affiliated Defendants are engaging in the private enterprise of theft.  Seychelles, by the

end of 2008, was in severe economic crisis.  Based on the pattern of behavior pleaded

above, the Seychelles Affiliated Defendants determined to use anti-money-laundering

enforcement as a pretext to seize the legitimate bank accounts of non-Seychellois

citizens.  As pleaded above, the Seychelles Affiliated Defendants do not care whether the

money seized by them is legitimate, <u>vel</u> <u>non</u>.  These defendants seek to do all in their

power to prevent legitimate non-Seychellois businesses and individuals from proving the

legitimacy of their money.  The actions of the Seychelles Affiliated Defendants constitute

pure commercial piracy -- and in one case, kidnapping.  Seychelles has determined to

transform itself into a pirate state.  In particular, the Irish Subcontractors, based on the

allegations in the Seychelles press, have their own private pecuniary interest to seize as

much as possible because they receive a commission based upon how much they

expropriate.  The FIU is not operated as a genuine government entity but is operated and controlled by Barry Galvin, who is in the private practice of law.

95.     In its 2008 "Human Rights Report: Seychelles," dated February 25, 2009, the United States Department of State reported that Seychelles officials, "sometimes engaged in corrupt practices with impunity" and that the World Bank has reported that "corruption was a problem."  The issues faced by Plaintiffs are consistent with these findings of the State Department and World Bank.

I.     The Commercial Enterprises of the Seychelles Affiliated
        Defendants Takes Place in Part in New York City.

96.     This illegitimate commercial enterprise of the Seychelles Affiliated Defendants has taken place, in part, in the City, County and State of New York.  First, Seychelles, through its agents and instrumentalities, particularly the Seychelles International Business Authority, has advertised Seychelles as an offshore banking center.  The government of Seychelles represents on its website the following false inducement as part of its commercial activity:

> Seychelles provides an excellent business environment
> since the country serves not only well as an offshore
> jurisdiction but also as a regional business hub.  Seychelles
> provides many advantages to business in the offshore sector
> due to its pro-active and stable government, modern
> business approach and modern reliable infrastructure as
> well being strategically situated.

See e.g., www.@gov.sc/Business/ForeignBusiness.aspx.

97.     These listings are most notable on the website of the Seychelles International Business Authority, an agency and instrumentality of Seychelles.  This promotion is directed at the entire Western financial world, of which New York City is the heart.  This promotion was intended to draw foreign currency, particularly United

States dollars, to Seychelles.  Although this promotion of Seychelles as an offshore banking center may have been initiated with legitimate aims, this overseas promotion continued even as the Seychelles Affiliated Defendants willfully plotted and thereafter implemented a scheme to seize non-Seychellois accounts even if they are entirely legitimate.  Consequently, the Seychelles Affiliated Defendants, since at least the end of 2008, have operated a commercial, overseas enterprise directed to attract United States dollars, with the intent to seize those dollars in order to help build the country's foreign reserves.  The Seychelles Affiliated Defendants have done just that here.

98.     In furtherance of this scheme, Seychelles has even sent Sylvianne Valmon, chief executive of the Seychelles government-funded Small Enterprise Promotion Agency, an agency of Seychelles, to the United States and United Nations to assist in opening U.S. markets for Seychellois businesses.  While in the United States, Ms. Valmon made several speeches and gave numerous interviews in order to promote Seychellois businesses.  Ms. Valmon and Seychelles also use the United States legislation entitled the African Growth Opportunity Act ("AGOA") to help promote and market Seychellois businesses in the United States.  The AGOA was designed to open United States markets for legitimate businesses from sub-Saharan Africa countries.

99.     Second, the Seychelles Affiliated Defendants here -- based on the evidence thus far available to Plaintiffs regarding the stalling, the dissembling and the false representations of the Barclays Defendants together with their following instructions of the Seychelles Affiliated Defendants -- began their scheme to seize the funds of Cooperhill and Kazou before these funds were wired though New York City to Seychelles.  The Seychelles Affiliated Defendants consequently planned to seize funds

that they knew would pass through New York City.  They caused funds to be wired through New York to a seized account in Seychelles.  In effect, these funds were seized the moment Barclays PLC wired the funds through New York City to Seychelles.  The unlawful seizure of funds being wired though New York City, together with the general activity of the Seychelles Affiliated Defendants to seize U.S. Dollars, constitutes commercial activity in the State, City, and County of New York.

100.    Third, the Seychelles Defendants have appeared in American proceedings regarding their campaign of expropriation without claiming sovereign immunity, thereby waiving any said immunity to jurisdiction.

101.    The Seychelles Affiliated Defendants have engaged in the commercial activity of seizing bank accounts, which activity has taken place in material part in the County, City, and State of New York.  This commercial activity of defendants has caused direct effects in the United States, including seizing dollars being wired through Barclays Bank in New York City.  The Seychelles Affiliated Defendants and the FIU have taken plaintiffs' property in violation of international law, which property was present in the United States in connection with a commercial activity carried out by the Seychelles Affiliated Defendants.

FIRST CLAIM FOR RELIEF BY COOPERHILL
AGAINST THE SEYCHELLES AFFILIATED DEFENDANTS
PURSUANT TO THE ALIEN TORT CLAIMS ACT, 28 U.S.C. § 1350.

102.    Plaintiff Cooperhill repeats and realleges the allegations of paragraphs 1 through 101 above as if fully set forth herein.

103.    By expropriating the funds of Plaintiff Cooperhill, the Seychelles Affiliated Defendants (being Seychelles, the FIU, Hogan, Galvin, Barber, and Cully) have violated the law of nations.

29

104. All Seychelles Affiliated Defendants are responsible for the conduct at issue -- the expropriation of the funds of Plaintiff Cooperhill.

105. The Seychelles Affiliated Defendants have committed the crimes and torts of fraud, theft and conversion against Cooperhill. By these actions, the Seychelles Affiliated Defendants have violated the law of nations.

106. By reason thereof, Plaintiff Cooperhill has been damaged by the acts of the Seychelles Affiliated Defendants in the amount of Ten Million Three Hundred Thousand USD ($10,300,000) Dollars in ordinary damages.

SECOND CLAIM FOR RELIEF BY KAZOU
AGAINST THE SEYCHELLES AFFILIATED DEFENDANTS
<u>PURSUANT TO THE ALIEN TORT CLAIMS ACT, 28 U.S.C. § 1350.</u>

107. Plaintiff Kazou repeats and realleges the allegations of paragraphs 1 through 106 above as if fully set forth herein.

108. By expropriating the funds of Plaintiff Kazou, the Seychelles Affiliated Defendants (being Seychelles, the FIU, Hogan, Galvin, Barber, and Cully) have violated the law of nations.

109. All Seychelles Affiliated Defendants are responsible for the conduct at issue -- the expropriation of the funds of Plaintiff Kazou.

110. The Seychelles Affiliated Defendants have committed the crimes and torts of fraud, theft and conversion against Kazou. By these actions, the Seychelles Affiliated Defendants have violated the law of nations.

111. By reason thereof, Plaintiff Kazou has been damaged by the acts of the Seychelles Affiliated Defendants in the amount of Four Hundred Twenty Six Thousand USD ($426,000) Dollars in ordinary damages.

THIRD CLAIM FOR RELIEF BY COOPERHILL
AGAINST THE SEYCHELLES AFFILIATED
DEFENDANTS FOR THEFT/CONVERSION OF FUNDS.

112.    Plaintiff Cooperhill repeats and realleges paragraphs 1 through 111 of this Complaint as if fully set forth herein.

113.    Defendant Seychelles, the FIU, and the Irish Subcontractors did wrongfully take the funds in the BMI Accounts by unlawfully retaining these funds and exercising dominion over them, despite Cooperhill's demand that Defendants Seychelles, the FIU, and the Irish Subcontractors return the property of Cooperhill and allow them to have full access to the BMI Accounts.

114.    Defendants Seychelles, the FIU, and the Irish Subcontractors refused to return control of the BMI Accounts to Cooperhill.

115.    Defendants Seychelles, the FIU, and the Irish Subcontractors have converted $10,300,000 from the BMI Accounts.

116.    By their wrongful actions, defendants Seychelles, the FIU, and the Irish Subcontractors have intentionally stolen the $10,300,000 of the funds from the BMI Accounts.

117.    As a direct and proximate result of the wrongful conduct of Defendants Seychelles, the FIU, and the Irish Subcontractors, Cooperhill has suffered and continues to suffer money damages.

118.    By reason thereof, Plaintiff Cooperhill has been damaged by the acts of the Seychelles Affiliated Defendants in the amount of Ten Million Three Hundred Thousand USD ($10,300,000) Dollars in ordinary damages.

FOURTH CLAIM FOR RELIEF BY KAZOU
AGAINST THE SEYCHELLES AFFILIATED
DEFENDANTS FOR THEFT/CONVERSION OF FUNDS.

119.     Plaintiff Kazou repeats and realleges paragraphs 1 through 118 of this

Complaint as if fully set forth herein.

120.     Defendant Seychelles, the FIU, and the Irish Subcontractors did

wrongfully take the funds in the Barclays Accounts by unlawfully retaining these funds

and exercising dominion over them, despite Kazou's demand that Defendants Seychelles,

the FIU, and the Irish Subcontractors return the property of Kazou and allow them to

have full access to the Barclays Accounts.

121.     Defendants Seychelles, the FIU, and the Irish Subcontractors refused to

return control of the Barclays Accounts to Kazou.

122.     Defendants Seychelles, the FIU, and the Irish Subcontractors have

converted $426,000 from the Barclays Accounts for the FIU's own use.

123.     By their wrongful actions, defendants Seychelles, the FIU, and the Irish

Subcontractors have intentionally stolen $426,000 from the Barclays Accounts.

124.     As a direct and proximate result of the wrongful conduct of Defendants

Seychelles, the FIU, and the Irish Subcontractors, Kazou has suffered and continues to

suffer money damages.

125.     By reason thereof, Plaintiff  Kazou has been damaged by the acts of the

Seychelles Affiliated Defendants in the amount of Four Hundred Twenty Six Thousand

USD ($426,000) Dollars in ordinary damages.

FIFTH CLAIM FOR RELIEF BY COOPERHILL
AGAINST THE SEYCHELLES AFFILIATED
DEFENDANTS FOR UNJUST ENRICHMENT.

126.    Plaintiff Cooperhill repeats and realleges the allegations of paragraphs 1 through 125 above as if fully set forth herein.

127.    The theft of the funds of Cooperhill by the Seychelles Affiliated Defendants unjustly enriches those defendants, including the Irish Subcontractors as pleaded above, at the expense of Cooperhill.

128.    The Seychelles Affiliated Defendants have seized possession of funds which in equity and good conscience are the property of Cooperhill.  The benefit of the funds have been conferred involuntarily by Plaintiff Cooperhill upon the Seychelles Affiliated Defendants.  The Seychelles Affiliated Defendants have knowledge of the benefit, and circumstances that make it unjust and inequitable for the Seychelles Affiliated Defendants to retain the benefit of these funds without paying this amount over to Cooperhill.

129.    By reason of the foregoing unjust enrichment, Plaintiff Cooperhill is entitled to payment of all of the funds misappropriated by the Seychelles Affiliated Defendants being Ten Million Three Hundred Thousand USD ($10,300,000) Dollars.

SIXTH CLAIM FOR RELIEF BY KAZOU
AGAINST THE SEYCHELLES AFFILIATED
DEFENDANTS FOR UNJUST ENRICHMENT.

130.    Plaintiff Kazou repeats and realleges the allegations of paragraphs 1 through 129 above as if fully set forth herein.

131.    The theft of the funds of Kazou by the Seychelles Affiliated Defendants unjustly enriches those defendants, including the Irish Subcontractors as pleaded above, at the expense of Kazou.

132.    The Seychelles Affiliated Defendants have seized possession of funds which in equity and good conscience are the property of Kazou.  The benefit of the funds have been conferred involuntarily by Plaintiff Kazou upon the Seychelles Affiliated Defendants.  The Seychelles Affiliated Defendants have knowledge of the benefit, and circumstances that make it unjust and inequitable for the Seychelles Affiliated Defendants to retain the benefit of these funds without paying this amount over to Kazou.

133.    By reason of the foregoing unjust enrichment, Plaintiff Kazou is entitled to payment of all of the funds misappropriated by the Seychelles Affiliated Defendants being Four Hundred Twenty Six Thousand USD ($426,000) Dollars.

SEVENTH CLAIM FOR RELIEF
BY COOPERHILL AGAINST
SEYCHELLES FOR COMMON LAW FRAUD.

134.    Plaintiff Cooperhill repeats and realleges the allegations of paragraphs 1 through 133 above as if fully set forth herein.

135.    Defendant Seychelles has caused its agencies and instrumentalities to advertise, in the United States and the rest of the world, Seychelles to be an offshore banking site.

136.    The representations on the following websites are examples of the representations made by agents and instrumentalities of Seychelles promoting Seychelles as an offshore banking center:

(a)    Promotion on the website of the Seychelles Investment Bureau that Seychelles was paving the way for a fast developing offshore sector, making financial and business products as the third pillar of the economy;

(b)    Representation on the website of the Seychelles Information Business Authority ("SIBA") that:

> Seychelles is a jurisdiction committed to providing an
> environment that strikes a realistic balance between client
> confidentiality in legitimate business matters and the desire
> to prevent money laundering and the use of corporate
> vehicles and trusts form criminal purposes.

       (c)      Representations by the Minister of Finance of Seychelles on October 31, 2008, available on SIBA's website that its aim was to facilitate the development of the rapidly growing financial service sector of Seychelles;

       (d)      Representations by Seychelles in its strategy 2017, available on several websites, that it was "developing Seychelles as a reputable offshore banking sector" and that "the financial services sector will continue to reflect international standards and best practices where applicable, so as to promote transparency and strengthen customer confidence;" and,

       (e)      In addition to promotion on websites, attendance by SIBA at most offshore investor conferences to promote Seychelles as an offshore banking center.

       137.    The representations made by agencies and instrumentalities of Seychelles that Seychelles was a legitimate offshore banking center were authorized by Seychelles, reflect the economic policy of Seychelles and thereby constitute the acts of Seychelles.

       138.    The representations made on behalf of Seychelles that Seychelles was a legitimate and trustworthy offshore banking center were materially false and misleading. These representations were false because (a) Seychelles operates its banking system in a highly irregular fashion; (b) Seychelles turned over its so-called anti-money laundering operations to the Irish Subcontractors, who have a pecuniary motive in maximizing the amount of funds seized; (c) Seychelles determined, in its economic crisis, to seize funds of foreign nationals whether or not these funds were derived from legitimate activities, (d) there is no semblance of due process once the FIU determines to seize funds, and (e)

Seychelles has abandoned any semblance of following international standards and best practices.

139.    Cooperhill, when it established bank accounts in Seychelles, reasonably relied upon those representations that Seychelles was a legitimate offshore banking center.

140.    In reasonable reliance upon the representations made by Seychelles that it was a legitimate offshore banking center, Cooperhill established the BMI Accounts and used them for Cooperhill's business.

141.    Cooperhill reasonably relied to its detriment upon the representations of Seychelles that it was a legitimate offshore banking center, when Seychelles, through the FIU, seized possession of the funds of Cooperill and is in the process of completing the theft of these funds.

142.    By reason of their reasonable reliance upon representations of Seychelles that it was a legitimate offshore banking center, Cooperhill has been damaged.

143.    By reason of the foregoing fraudulent representations, Cooperhill seeks damages against Seychelles in the amount of Ten Million Three Hundred Thousand ($10,300,000) Dollars in ordinary damages.

EIGHTH CLAIM FOR RELIEF
BY KAZOU AGAINST
<u>SEYCHELLES FOR COMMON LAW FRAUD.</u>

144.    Plaintiff Kazou repeats and realleges the allegations of paragraphs 1 through 143 above as if fully set forth herein.

145.    Defendant Seychelles has caused its agencies and instrumentalities to advertise, in the United States and the rest of the world, Seychelles to be an offshore banking site.

36

146.    The representations on the following websites are examples of the representations made by agents and instrumentalities of Seychelles promoting Seychelles as an offshore banking center:

(a)     Promotion on the website of the Seychelles Investment Bureau that Seychelles was paving the way for a fast developing offshore sector, making financial and business products as the third pillar of the economy;

(b)     Representation on the website of the Seychelles Information Business Authority ("SIBA") that:

> Seychelles is a jurisdiction committed to providing an environment that strikes a realistic balance between client confidentiality in legitimate business matters and the desire to prevent money laundering and the use of corporate vehicles and trusts form criminal purposes.

(c)     Representations by the Minister of Finance of Seychelles on October 31, 2008, available on SIBA's website that its aim was to facilitate the development of the rapidly growing financial service sector of Seychelles;

(d)     Representations by Seychelles in its strategy 2017, available on several websites, that it was "developing Seychelles as a reputable offshore banking sector" and that "the financial services sector will continue to reflect international standards and best practices where applicable, so as to promote transparency and strengthen customer confidence;" and,

(e)     In addition to promotion on websites, attendance by SIBA at most offshore investor conferences to promote Seychelles as an offshore banking center.

147.    The representations made by agencies and instrumentalities of Seychelles that Seychelles was a legitimate offshore banking center were authorized by Seychelles, reflect the economic policy of Seychelles and thereby constitute the acts of Seychelles.

148.    The representations made on behalf of Seychelles that Seychelles was a legitimate and trustworthy offshore banking center were materially false and misleading. These representations were false because (a) Seychelles operates its banking system in a highly irregular fashion; (b) Seychelles turned over its so-called anti-money laundering operations to the Irish Subcontractors, who have a pecuniary motive in maximizing the amount of funds seized; (c) Seychelles determined, in its economic crisis, to seize funds of foreign nationals whether or not these funds were derived from legitimate activities, (d) there is no semblance of due process once the FIU determines to seize funds, and (e) Seychelles has abandoned any semblance of following international standards and best practices.

149.    Kazou, when it established bank accounts in Seychelles, reasonably relied upon those representations that Seychelles was a legitimate offshore banking center.

150.    In reasonable reliance upon the representations made by Seychelles that it was a legitimate offshore banking center, Kazou established the BMI Accounts and used them for Kazou's business.

151.    Kazou reasonably relied to its detriment upon the representations of Seychelles that it was a legitimate offshore banking center, when Seychelles, through the FIU, seized possession of the funds of Kazou and is in the process of completing the theft of these funds.

152.    By reason of their reasonable reliance upon representations of Seychelles that it was a legitimate offshore banking center, Kazou has been damaged.

153.    By reason of the foregoing fraudulent representations, Kazou seeks damages against Seychelles in the amount of Four Hundred Twenty Six Thousand USD ($426,000) Dollars in ordinary damages.

NINTH CLAIM FOR RELIEF BY
COOPERHILL AGAINST DEFENDANT
SEYCHELLES FOR FRAUDULENT OMISSION.

154.    Plaintiff Cooperhill repeats and realleges the allegations of paragraphs 1 through 153 above as if fully set forth herein.

155.    The representations made on behalf of Seychelles described in the Seventh and Eighth Claims above that it was a legitimate offshore banking center were partial, misleading representations that failed to disclose that:

(a)    Seychelles operates its banking system in a highly irregular manner;

(b)    Seychelles turned over its so-called anti-money laundering operations to the Irish Subcontractors, who have a pecuniary motive in maximizing the amount of funds seized;

(c)    Seychelles determined in its economic crisis to seize funds of foreign nationals, whether or not these funds were derived from legitimate activities;

(d)    There is no semblance of due process once the FIU determines to seize the funds; and,

(e)    Seychelles had determined to abandon any semblance of following international standards and best practices.

156.    Cooperhill reasonably relied upon these fraudulent omissions to their detriment, by forming the BMI Accounts and by using them for Cooperhill's business.

157.    By reason of their reasonable reliance upon the fraudulent omissions, Cooperhill has been damaged.

158.    By reason thereof, Plaintiff Cooperhill has been damaged by the acts of the Seychelles Affiliated Defendants in the amount of Ten Million Three Hundred Thousand USD ($10,300,000) Dollars in ordinary damages.

TENTH CLAIM FOR RELIEF BY
KAZOU AGAINST DEFENDANT
<u>SEYCHELLES FOR FRAUDULENT OMISSION.</u>

159.    Plaintiff Kazou repeats and realleges the allegations of paragraphs 1 through 158 above as if fully set forth herein.

160.    The representations made on behalf of Seychelles described in the Seventh and Eighth Claims above that it was a legitimate offshore banking center were partial, misleading representations that failed to disclose that:

(a)    Seychelles operates its banking system in a highly irregular manner;

(b)    Seychelles turned over its so-called anti-money laundering operations to the Irish Subcontractors, who have a pecuniary motive in maximizing the amount of funds seized;

(c)    Seychelles determined in its economic crisis to seize funds of foreign nationals, whether or not these funds were derived from legitimate activities;

(d)    There is no semblance of due process once the FIU determines to seize the funds; and,

(e)    Seychelles had determined to abandon any semblance of following international standards and best practices.

161.    Kazou reasonably relied upon these fraudulent omissions to their detriment, by forming the Barclays Accounts and by using them for Kazou's business.

162.    By reason of their reasonable reliance upon the fraudulent omissions, Kazou has been damaged.

163.    By reason thereof, Plaintiff  Kazou has been damaged by the acts of the Seychelles Affiliated Defendants in the amount of Four Hundred Twenty Six Thousand USD ($426,000) Dollars in ordinary damages.

ELEVENTH CLAIM FOR RELIEF
BY COOPERHILL FOR
ABUSE OF PROCESS AGAINST THE
SEYCHELLES AFFILIATED DEFENDANTS.

164.    Plaintiff Cooperhill repeats and realleges the allegations of paragraphs 1 through 163 above as if fully set forth herein.

165.    Defendants Seychelles, FIU, Hogan, Galvin, Barber, and Cully caused process to be issued in Seychelles, freezing the BMI Accounts and thereafter seizing possession of funds being wired to Seychelles, in part, through New York.

166.    The above-mentioned Seychelles Affiliated Defendants, in causing process to be issued, failed to conduct any reasonable investigation, refused to consider any contrary evidence, intentionally froze and seized funds they knew to be legitimate and either made perjurious statements, or relied upon perjurious statements, to obtain their unlawful objectives.

167.    The aforementioned Seychelles Affiliated Defendants intended to do harm to Cooperhill without excuse or justification.

168.    The aforementioned Seychelles Affiliated Defendants have used process in a perverted manner to obtain the collateral objective of stealing the funds of Cooperhill without excuse or justification.

169.    By reason of this abuse of process, Plaintiff Cooperhill has been damaged in the amount of Ten Million Three Hundred Thousand USD ($10,300,000) Dollars in ordinary damages.

### TWELFTH CLAIM FOR
### RELIEF BY KAZOU FOR ABUSE
### OF PROCESS AGAINST THE
### SEYCHELLES AFFILIATED DEFENDANTS.

170.    Plaintiff Kazou repeats and realleges the allegations of paragraphs 1 through 169 above as if fully set forth herein.

171.    Defendants Seychelles, FIU, Hogan, Galvin, Barber, and Cully caused process to be issued in Seychelles, freezing the Barclays Accounts and thereafter seizing possession of funds being wired to Seychelles, in part, through New York.

172.    The above-mentioned Seychelles Affiliated Defendants, in causing process to be issued, failed to conduct any reasonable investigation, refused to consider any contrary evidence, intentionally froze and seized funds they knew to be legitimate and either made perjurious statements, or relied upon perjurious statements, to obtain their unlawful objectives.

173.    The aforementioned Seychelles Affiliated Defendants intended to do harm to Kazou without excuse or justification.

174.    The aforementioned Seychelles Affiliated Defendants have used process in a perverted manner to obtain the collateral objective of stealing the funds of Kazou without excuse or justification.

175.     By reason of this abuse of process, Plaintiff  Kazou has been damaged in the amount of Four Hundred Twenty Six Thousand USD ($426,000) Dollars in ordinary damages.

### THIRTEENTH CLAIM BY COOPERHILL
### FOR RELIEF AGAINST THE SEYCHELLES
### AFFILIATED DEFENDANTS FOR ABUSE OF AUTHORITY.

176.     Plaintiff Cooperhill repeats and realleges the allegations of paragraphs 1 through 175 above as if fully set forth herein.

177.     By reason of the above-pleaded abuse, excess, misuse and distortion of authority by the Seychelles Affiliated Defendants, Cooperhill has been damaged.

178.     By reason of the foregoing, Plaintiff Cooperhill has been damaged in the amount of Ten Million Three Hundred Thousand USD ($10,300,000) Dollars in ordinary damages.

### FOURTEENTH CLAIM BY KAZOU
### FOR RELIEF AGAINST THE SEYCHELLES
### AFFILIATED DEFENDANTS FOR ABUSE OF AUTHORITY.

179.     Plaintiff Kazou repeats and realleges the allegations of paragraphs 1 through 179 above as if fully set forth herein.

180.     By reason of the above-pleaded abuse, excess, misuse and distortion of authority by the Seychelles Affiliated Defendants, Kazou has been damaged.

181.     By reason of the foregoing, Plaintiff  Kazou has been damaged in the amount of Four Hundred Twenty Six Thousand USD ($426,000) Dollars in ordinary damages.

FIFTEENTH CLAIM FOR RELIEF BY
COOPERHILL AGAINST THE BMI DEFENDANTS
FOR FRAUD AND FRAUD IN THE INDUCEMENT.

182.    Plaintiff Cooperhill repeats and realleges paragraphs 1 through 181 of this Complaint as if fully set forth herein.

183.    BMI represented and continues to represent in its website that its core values are "Integrity & Ethical Behavior, Customer Satisfaction, Quality & Excellence, Empowerment & Trust."  See http://www.bmi.com and http://www.bmi.com.sc.  BMI further represented and continues to represent that BMI maintains its "integrity, creating and sharing trust and practicing ethical behavior."  BMI also represented and continues to represent that BMI's vision was to "create a universal bank with a presence in selected emerging markets, differentiating itself through its focus on customers and market leading products and processes, in the process delivering top-quartile returns to our shareholders."  BMI represented and continues to represent that its "strategy is to meet and exceed customer's expectation by providing superior service.  We seek to do that by bringing together a team of committed staff and leveraging from expertise with our group network."  BMI represented and continues to represent in a quote from its CEO Andrew Bainbridge that:

> Our customers are the reason why are all employed and they have a right to great service from us.  Banks are not 'go to' destinations.  Banks are enablers – we help people to achieve their life and business goals by supporting them with a range of financial services that suit their aspirations and their ability to save and / or repay.  If we do not serve our customers brilliantly, then we have no right to retain their business.

184.    BMI represented and continues to represent that Seychelles offered an attractive offshore location and that, as quoted from BMI CEO Andrew Bainbridge, "We

see Seychelles as an attractive location for an offshore banking operation, supported by good legal and regulatory framework in the country, its stable economic and political environment ...."  Capitalizing on this statement, BMI represented and continues to represent that the "comment from our CEO, captures in a nutshell the unique offshore environment that has raised the profile of Seychelles as one of the most attractive and dynamic offshore jurisdictions in the world today and attracted BMI to these shores." BMI represented and continues to represent that among the key features of Seychelles is that it is supported "by one of the best legal and regulatory regimes in the financial world."

185.    BMI represented and continues to represent on its website in a section entitled "Tête-à-tête with Seychelles MD" -- who is managing director Frank Hoareau discussed above -- that "Seychelles is an attractive location for offshore business supported by good legal and regulatory framework of the country and its stable political and economic environment," and that "[m]y vision is to build the business into a premier offshore  bank in the jurisdiction giving a broad range of offshore products to our customers with a first class service ...."   Frank Horeau, managing director of BMI also made assurances and statements to Cooperhill -- when he lured Cooperhill to BMI Seychelles in 2008 as discussed above -- that BMI Seychelles was a safe place for Cooperhill to conduct its banking activities.

186.    Cooperhill and its representatives relied upon the above representations of the BMI Defendants when they chose to open the BMI Accounts.

187.    The representations made by BMI about BMI Seychelles were false. Contrary to the representations made by BMI about BMI Seychelles, it was not

committed to meeting and exceeding customer's expectations because it operated under the dominion and control of the Seychelles Affiliated Defendants to serve the interests of Seychelles first; BMI Seychelles did not provide great service, serve Cooperhill brilliantly or bring the benefit of a universal BMI Bank with services to its Seychelles customers but, instead, a highly inferior level of service that looked first to curry favor with Seychelles and its agents, instrumentalities and its subcontractors; BMI Seychelles failed to provide any comprehensive support for its customers, had no intent to build close relationships with its customers, failed to attempt to meet its customers' needs, failed to offer reliable and professional services to its customers, failed to provide the worldwide support for its customers' needs but instead, at the behest of Seychelles, its agents, instrumentalities and subcontractors, would act in a manner inimical to its customers.  The highest priority of  the BMI Defendants, contrary to their representations, was to favor the interests of Seychelles, even when these interests ran counter to the legitimate interests of the customers of BMI.

188.     Prior to the date that Cooperhill caused the BMI Accounts to be opened, the BMI Defendants necessarily had become aware that their representations regarding the services provided by BMI Seychelles, including those on the BMI website, were false.  With knowledge of the falsity of the representations contained on their website regarding banking services provided in Seychelles, the BMI Defendants continued to make these representations.  By reason thereof, BMI Seychelles made representations regarding the quality of banking services that they were able to provide in Seychelles with knowledge of their falsity.

189.    Cooperhill relied to its detriment upon the representations of the BMI Defendants and its managing director Frank Horeau, as pleaded above, when Cooperhill opened the BMI Accounts.

190.    In breach of its representations regarding the quality of services that they provided in Seychelles, the BMI Defendants, during the time when Cooperhill was establishing the BMI Accounts, contacted representatives of Seychelles and/or its agents, instrumentalities and subcontractors, without informing Cooperhill or its representatives.

191.    The following factual contentions will likely have evidentiary support after a reasonable opportunity for discovery: before any funds were deposited into the BMI Account (a) the BMI Defendants knew that the FIU had investigated this account; (b) the BMI Defendants had communicated to the FIU regarding the BMI Account; (c) the BMI Defendants had provided information to the FIU regarding the BMI Accounts and Cooperhill; and, (d) the BMI Defendants knew that the FIU had frozen the BMI Accounts and intended to seize any funds deposited therein.

192.    In reasonable reliance upon these false representations of the BMI Defendants, Cooperhill opened the BMI Accounts and, at the time of the FIU's seizure, the accounts held $10,300,000.

193.    By reason of its justifiable reliance upon the misrepresentations of the BMI Defendants, Cooperhill has been damaged.

194.    By reason of the fraud of the BMI Defendants, Plaintiff Cooperhill has been damaged in the amount of Ten Million Three Hundred Thousand ($10,300,000) Dollars in ordinary damages.

SIXTEENTH CLAIM FOR RELIEF BY KAZOU
AGAINST THE BARCLAYS DEFENDANTS
FOR FRAUD AND FRAUD IN THE INDUCEMENT.

195.    Plaintiff Kazou repeats and realleges paragraphs 1 through 194 of this

Complaint as if fully set forth herein.

196.    Barclays represented and continues to represent in its website that it is the

leading private sector bank in Seychelles and that, it is "committed to providing the

highest level of customer service."  Barclays further represented and continues to

represent that the Barclays name, which is recognized worldwide, gave Barclays

Seychelles a true global reach.  Barclays represented and continues to represent that it

was able to bring the benefits of Barclays financial services to customers in Seychelles,

that it provided comprehensive support, that its aim was to build a close relationship with

its customers, that it wanted its business customers to turn first to Barclays for their

business needs, that Barclays offered personal service in a reliable and professional style

and that customers could draw upon the Barclays Group worldwide to support and meet

their every need.  Barclays stated and continues to state that its philosophy was one of

partnership because Barclays recognized that a customer's success was Barclays'

success.

197.    Kazou and its representatives relied upon the above representations of the

Barclays Defendants when it chose to open the Barclays Accounts.

198.    The representations made by Barclays about Barclays Seychelles were

false.  Contrary to the representations made by Barclays about Barclays Seychelles, it

was not committed to the highest level of customer services because it operated under the

dominion and control of the Seychelles Affiliated Defendants to serve the interests of

Seychelles first; Barclays Seychelles did not bring the benefit of Barclays Bank services

to its Seychelles customers but a highly inferior level of service that looked first to curry favor with Seychelles and its agents, instrumentalities and its subcontractors; Barclays Seychelles failed to provide any comprehensive support for its customers, had no intent to build close relationships with its customers, failed to attempt to meet its customers' needs, failed to offer reliable and professional services to its customers, failed to provide the worldwide support for its customers' needs and developed no level of partnership with its customers but instead, at the behest of Seychelles, its agents, instrumentalities and subcontractors, would act in a manner inimical to its customers.  As the largest private bank in Seychelles, the highest priority of  the Barclays Defendants, contrary to their representations, was to favor the interests of Seychelles, even when these interests ran counter to the legitimate interests of the customers of Barclays.

199.    Prior to the date that Kazou caused the Barclays Accounts to be opened, the Barclays Defendants necessarily had become aware that their representations regarding the services provided by Barclays Seychelles, including those on the Barclays website, were false.  With knowledge of the falsity of the representations contained on their website regarding banking services provided in Seychelles, the Barclays Defendants continued to make these representations.  By reason thereof, Barclays Seychelles made representations regarding the quality of banking services that they were able to provide in Seychelles with knowledge of their falsity.

200.    Kazou relied to its detriment upon the representations of the Barclays Defendants when it opened the Barclays Accounts.

201.    In breach of its representations regarding the quality of services that they provided in Seychelles, the Barclays Defendants, during the time when Kazou was

establishing the Barclays Accounts, contacted representatives of Seychelles and/or its agents, instrumentalities and subcontractors, without informing Kazou or its representatives.

202.    The following factual contentions will likely have evidentiary support after a reasonable opportunity for discovery: before any funds were deposited into the Barclays Account (a) the Barclays Defendants knew that the FIU had investigated this account; (b) the Barclays Defendants had communicated to the FIU regarding the Barclays Account; (c) the Barclays Defendants had provided information to the FIU regarding the Barclays Accounts and Kazou; and, (d) the Barclays Defendants knew that the FIU had frozen the Barclays Accounts and intended to seize any funds deposited therein.

203.    In reasonable reliance upon these false representations of the Barclays Defendants, Kazou opened the Barclays Accounts and, at the time of the FIU's seizure, the accounts held $426,000.

204.    By reason of its justifiable reliance upon the misrepresentations of the Barclays Defendants, Kazou has been damaged.

205.    By reason of the fraud of the Barclays Defendants, Plaintiff Kazou has been damaged in the amount of Four Hundred Twenty Six Thousand ($426,000) Dollars in ordinary damages.

SEVENTEENTH CLAIM FOR RELIEF BY
COOPERHILL AGAINST THE BMI
DEFENDANTS FOR FRAUDULENT OMISSIONS.

206.     Plaintiff Cooperhill repeats and realleges paragraphs 1 through 205 of this Complaint as if fully set forth herein.

207.     As pleaded above, the BMI Defendants made partial, misleading statements to Cooperhill and its representatives that BMI Seychelles was operated in a manner similar to other BMI Bank operations and those of its owners and affiliates, that all matters were in order regarding the establishment of the BMI Account, as more specifically pleaded above.

208.     The BMI Defendants owed a duty to Cooperhill to make full and complete disclosures concerning the machinations of the Seychelles Affiliated Defendants to seize the funds of Cooperhill in the BMI Account once those BMI Defendants had made partial, misleading representations regarding the BMI Account.

209.     The BMI Defendants further had a fiduciary duty or an obligation equivalent to a fiduciary duty (See the Nineteenth Claim for Relief, the allegations of which are incorporated herein) which they owed to a depositor to describe fully to Cooperhill the machinations of the Seychelles Affiliated Defendants to seize Cooperhill's funds from the BMI Account.  The relationship between Cooperhill and the BMI Defendants required full disclosure to the customer that its funds were about to be stolen, with the BMI Defendants assisting those perpetrating the theft.

210.     The BMI Defendants failed to make disclosures to Cooperhill regarding the ongoing theft of Cooperhill funds by the Seychelles Affiliated Defendants with scienter and with knowledge that these failures to disclose would injure Cooperhill.

51

211.    Cooperhill reasonably relied upon the fraudulent omissions of the BMI Defendants to their detriment.

212.    By reason of the foregoing, Cooperhill has been damaged in the amount of Ten Million Three Hundred Thousand ($10,300,000) Dollars in ordinary damages.

EIGHTEENTH CLAIM FOR RELIEF BY
KAZOU AGAINST THE BARCLAYS
<u>DEFENDANTS FOR FRAUDULENT OMISSIONS.</u>

213.    Plaintiff Kazou repeats and realleges paragraphs 1 through 212 of this Complaint as if fully set forth herein.

214.    As pleaded above, the Barclays Defendants made partial, misleading statements to Kazou and its representatives that Barclays Seychelles was operated in a manner similar to other Barclays Bank operations, that all matters were in order regarding the establishment of the Barclays Account, as more specifically pleaded above.

215.    The Barclays Defendants owed a duty to Kazou to make full and complete disclosures concerning the machinations of the Seychelles Affiliated Defendants to seize the funds of Kazou in the Barclays Account once those Barclays Defendants had made partial, misleading representations regarding the Barclays Account.

216.    The Barclays Defendants further had a fiduciary duty or an obligation equivalent to a fiduciary duty (See the Twentieth Claim for Relief, the allegations of which are incorporated herein) which they owed to a depositor to describe fully to Kazou the machinations of the Seychelles Affiliated Defendants to seize Kazou's funds from the Barclays Account.  Since the Barclays Defendants represented their "partnership" with their customers, any such partnership required full disclosure to the customer that its funds were about to be stolen, with the Barclays Defendants assisting those perpetrating the theft.

52

217.    The Barclays Defendants failed to make disclosures to Kazou regarding the ongoing theft of Kazou's funds by the Seychelles Affiliated Defendants with scienter and with knowledge that these failures to disclose would injure Plaintiff Kazou.

218.    Kazou reasonably relied upon the fraudulent omissions of the Barclays Defendants to their detriment.

219.    By reason of the foregoing, Kazou has been damaged in the amount of Four Hundred Twenty Six Thousand ($426,000) Dollars in ordinary damages.

NINETEENTH CLAIM FOR
RELIEF BY PLAINTIFF COOPERHILL
AGAINST THE BMI DEFENDANTS
FOR BREACH OF FIDUCIARY DUTY.

220.    Plaintiff Cooperhill repeats and realleges paragraphs 1 through 219 of this Complaint as if fully set forth herein.

221.    The BMI defendants (i) by their assurances that they are creating a type of "personalized service" that would "meet and exceed customer's expectations," (ii) by stating that they would look out for the interests of its customers, (iii) by the assurances and statements made by Frank Horeau, managing director of BMI Seychelles, who knew Cooperhill well from the prior relationship when he acted as Cooperhill's banker at a prior ban, and (iv) by reason of the special trust and confidence that Cooperhill placed in Mr. Horeau when he convinced Cooperhill to move its accounts from that prior bank to BMI Seychelles, intended to induce, and did induce Plaintiff Cooperhill to place special trust and confidence in them.

222.    Plaintiff Cooperhill placed special trust and confidence in and relied on the BMI Defendants' and Frank Horeau's representations and guidance in the establishment, management, and operation of the BMI Accounts.  In particular,

Cooperhill relied upon BMI as an institution in a tiny Third-World country, of which

Cooperhill had limited knowledge.  Cooperhill relied upon the BMI Defendants to

provide their customary level of banking services in this Third World country.

223.    Plaintiff Cooperhill placed a particularly high level of trust and confidence

in and relied on the BMI Defendants when it moved accounts from a different bank at the

urging of Frank Horeau and opened the BMI Accounts and used them for Cooperhill's

business, based on the BMI Defendants' and Frank Horeau's assurances that they would

get full access of the BMI Account and the funds deposited therein.  The BMI Defendants

knew that Plaintiff Cooperhill relied on them and placed a high level of trust and

confidence in them and in Frank Horeau.  The BMI Defendants knew that Plaintiff

Cooperhill was located in another country thousands of miles away and placed special

reliance on what the BMI Defendants told them during multiple communications, pleaded

above, regarding the status of the BMI Account.  Plaintiff Cooperhill had no other way of

learning about the status of the BMI Account besides relying on and trusting the BMI

Defendants' representations.

224.    By reason of the foregoing, there arose a fiduciary relationship between

Plaintiff Cooperhill, on the one hand, and the BMI Defendants, on the other hand,

pursuant to which the BMI Defendants owed Cooperhill a fiduciary duty.  The BMI

Defendants owed to Cooperhill the affirmative duty of utmost good faith and full and fair

disclosure of all material facts.  The BMI Defendants owed Cooperhill the affirmative

obligation not to mislead it.

225.    The BMI Defendants breached the fiduciary duty that they owed to

Plaintiff Cooperhill by helping the FIU, who had engaged in a bad-faith scheme to steal

these Cooperhill's funds.  The BMI Defendants breached the fiduciary duty that they owed to Plaintiff Cooperhill by, inter alia, not providing good-faith disclosure of the FIU's wrongful scheme and unlawful aims, and by assisting the FIU in its purpose to steal the BMI Account and the funds contained therein.

226.     By reason of the breach of fiduciary duty by the BMI Defendants, Plaintiff Cooperhill has been damaged in the amount of Ten Million Three Hundred Thousand ($10,300,000) Dollars in ordinary damages.

TWENTIETH CLAIM FOR
RELIEF BY PLAINTIFF KAZOU AGAINST
THE BARCLAYS DEFENDANTS FOR
BREACH OF FIDUCIARY DUTY.

227.     Plaintiff Kazou repeats and realleges paragraphs 1 through 226 of this Complaint as if fully set forth herein.

228.     By its assurances that they are creating a type of "partnership" with its customers and by stating that they would look out for the interests of its customers, the Barclays Defendants intended to induce, and did induce, its customers in Seychelles, including Plaintiff Kazou, to place special trust and confidence in them.

229.     Plaintiff Kazou placed special trust and confidence in and relied on the Barclays Defendants' above-pleaded representations and guidance in the establishment, management, and operation of the Barclays Account.  In particular, Kazou relied upon Barclays as an institution in a tiny Third-World country, of which Plaintiff Kazou had limited knowledge.  Plaintiff Kazou relied upon the Barclays Defendants to provide their customary level of banking services in this Third World country.

230.     Plaintiff Kazou placed a particularly high level of trust and confidence in and relied on the Barclays Defendants when they, based on the Barclays Defendants'

assurances that they would get full access of the Barclays Account and the funds deposited therein. The Barclays Defendants knew that Plaintiff Kazou relied on them and placed a high level of trust and confidence in them. The Barclays Defendants knew that Plaintiff Kazou was located in another country thousands of miles away and placed special reliance on what the Barclays Defendants told them regarding the status of the Barclays Account. Plaintiff Kazou had no other way of learning about the status of the Barclays Account besides relying on and trusting the Barclays Defendants' representations.

231.    By reason of the foregoing, there arose a fiduciary relationship between Plaintiff Kazou, on the one hand, and the Barclays Defendants, on the other hand, pursuant to which the Barclays Defendants owed Kazou a fiduciary duty. The Barclays Defendants owed to Kazou the affirmative duty of utmost good faith and full and fair disclosure of all material facts. The Barclays Defendants owed Plaintiff Kazou the affirmative obligation not to mislead.

232.    The Barclays Defendants breached the fiduciary duty that they owed to Plaintiff Kazou by helping the FIU, who had engaged in a bad-faith scheme to steal Kazou's funds. The Barclays Defendants breached the fiduciary duty that they owed to Plaintiff Kazou by, inter alia, not providing good-faith disclosure of the FIU's wrongful scheme and unlawful aims, and by assisting the FIU in its purpose to steal the Barclays Account and the funds contained therein, and by not protecting the interests of customers who were the intended victims, not the perpetrators, of an international fraudulent scheme.

233.    By reason of the breach of fiduciary duty by the Barclays Defendants, Plaintiff Kazou has been damaged in the amount of Four Hundred Twenty Six Thousand ($426,000) Dollars in ordinary damages.

TWENTY FIRST CLAIM FOR RELIEF
BY PLAINTIFF COOPERHILL AGAINST THE
<u>BMI DEFENDANTS FOR BREACH OF CONTRACT.</u>

234.    Plaintiff Cooperhill repeats and realleges paragraphs 1 through 233 of this Complaint as if fully set forth herein.

235.    By opening a bank account with the BMI Defendants, Plaintiff Cooperhill entered into a contractual relationship with the BMI Defendants.

236.    The agreement by the BMI Defendants to open and maintain a bank account for Cooperhill included the obligation to manage, operate and oversee the BMI Account in a commercially reasonable manner.  Obligations of good faith and fair dealing implied in every contract required the BMI Defendants not to engage in conduct which would unreasonably injure Cooperhill's interests.  In addition, the contractual agreement between Cooperhill and the BMI Defendants must be deemed to include the covenants and representations of the BMI Defendants contained in the BMI website that the BMI Defendants were committed to the highest level of customer service, that they would bring comprehensive support, that they would build close relationships with their customers, that they would provide professional and reliable service.

237.    In breach of their contractual obligations to Plaintiff Cooperhill, the BMI Defendants unreasonably and without notice to these Plaintiffs reported to the FIU that there was suspicious activity with respect to the BMI Account.  Cooperhill had provided all information to the BMI Defendants requested by them.  If the BMI Defendants had any inkling of doubt about the <u>bona fides</u> of Plaintiff Cooperhill, they could have -- and

57

should have -- obtained whatever information they needed from Plaintiff Cooperhill. Rather than protect the legitimate interests of Plaintiff Cooperhill, their customer, the BMI Defendants secretly became agents of the FIU, seeking information from Cooperhill that the FIU requested, and transmitting that information to the FIU.  The BMI Defendants, in breach of the contractual obligation that they owed to Plaintiff Cooperhill, conspired with the Seychelles Affiliated Defendants in their efforts to seize the BMI Account and the funds deposited therein.

238.    In secretly providing assistance to the Seychelles Affiliated Defendants, the BMI Defendants knew or recklessly disregarded that the Seychelles Affiliated Defendants would seek to steal the funds deposited in the BMI Account.  Without a reasonable basis, the BMI Defendants identified for subcontractors and agents of a country in economic crisis the BMI Account that held large amounts of funds, with the knowledge or reckless indifference that the country, desperate for foreign currency, would do anything to obtain these funds.

239.    The BMI Defendants continued to cooperate and conspire with the Seychelles Affiliated Defendants by assisting them in their efforts to seize the BMI Account and the funds therein without the knowledge or consent of Cooperhill.

240.    By reason of this breach of contract, Plaintiff Cooperhill has been damaged in the amount of Ten Million Three Hundred Thousand ($10,300,000) Dollars in ordinary damages.

TWENTY SECOND CLAIM FOR RELIEF
BY PLAINTIFF KAZOU AGAINST THE BARCLAYS
DEFENDANTS FOR BREACH OF CONTRACT.

241.     Plaintiff Kazou repeats and realleges paragraphs 1 through 240 of this

Complaint as if fully set forth herein.

242.     By opening a bank account with the Barclays Defendants, Plaintiff Kazou

entered into a contractual relationship with the Barclays Defendants.

243.     The agreement by the Barclays Defendants to open and maintain a bank

account for Kazou included the obligation to manage, operate and oversee the Barclays

Account in a commercially reasonable manner.  Obligations of good faith and fair dealing

implied in every contract required the Barclays Defendants not to engage in conduct

which would unreasonably injure Kazou's interests.  In addition, the contractual

agreement between Kazou and the Barclays Defendants must be deemed to include the

covenants and representations of the Barclays Defendants contained in the Barclays

website that the Barclays Defendants were committed to the highest level of customer

service, that they would bring comprehensive support, that they would build close

relationships with their customers, that they would provide professional and reliable

service, that the members of the Barclays Group would provide worldwide support and

that they were in a partnership arrangement with their customers.

244.     In breach of their contractual obligations to Plaintiff Kazou, the Barclays

Defendants unreasonably and without notice to Kazou reported to the FIU that there was

suspicious activity with respect to the Barclays Account.  Kazou had provided all

information to the Barclays Defendants requested by them.  If the Barclays Defendants

had any inkling of doubt about the bona fides of Plaintiff Kazou, they could have -- and

should have -- obtained whatever information they needed from Plaintiff Kazou.  Rather

than protect the legitimate interests of Plaintiff Kazou, their customer, the Barclays Defendants secretly became agents of the FIU, seeking information from Kazou that the FIU requested, and transmitting that information to the FIU. The Barclays Defendants, in breach of the contractual obligation that they owed to Plaintiff Kazou, conspired with the Seychelles Affiliated Defendants in their efforts to seize the Barclays Account and the funds deposited therein.

245. In secretly providing assistance to the Seychelles Affiliated Defendants, the Barclays Defendants knew or recklessly disregarded that the Seychelles Affiliated Defendants would seek to steal the funds deposited in the Barclays Account. Without a reasonable basis, the Barclays Defendants identified for subcontractors and agents of a country in economic crisis the Barclays Account that held large amounts of funds, with the knowledge or reckless indifference that the country, desperate for foreign currency, would do anything to obtain these dollars.

246. The Barclays Defendants continued to cooperate and conspire with the Seychelles Affiliated Defendants by assisting them in their efforts to seize the Barclays Account and the funds therein without the knowledge or consent of Kazou.

247. By reason of this breach of contract, Plaintiff Kazou has been damaged in the amount of Four Hundred Twenty Six Thousand ($426,000) Dollars in ordinary damages.

TWENTY THIRD CLAIM FOR RELIEF
BY PLAINTIFF COOPERHILL
AGAINST THE BMI DEFENDANTS
FOR NEGLIGENT MISREPRESENTATION.

248.    Plaintiff Cooperhill repeats and realleges paragraphs 1 through 247 of this

Complaint as if fully set forth herein.

249.    The BMI Defendants owed Plaintiff Cooperhill a duty of care as

customers of BMI. This duty of care required the BMI Defendants to fully, completely,

honestly, and accurately give full disclosure to Cooperhill about the BMI Account and

Cooperhill's banking relationship with the BMI Defendants.

250.    As pleaded above, the BMI Defendants made representations to Plaintiff

Cooperhill about the BMI Account and Cooperhill's banking relationship with the BMI

Defendants that were partial, incomplete, false and inaccurate.  These misrepresentations,

to the extent not intentional or reckless, were made with gross negligence.

251.    Plaintiff Cooperhill reasonably relied upon these grossly negligent

misrepresentations when opening the BMI Accounts and when using them for

Cooperhill's business.

252.    By reason of the grossly negligent misrepresentations of the BMI

Defendants, Plaintiff Cooperhill have been damaged in the amount of Ten Million Three

Hundred Thousand ($10,300,000) Dollars in ordinary damages.

TWENTY FOURTH CLAIM FOR RELIEF
BY PLAINTIFF KAZOU AGAINST
THE BARCLAYS DEFENDANTS
FOR NEGLIGENT MISREPRESENTATION.

253.    Plaintiff Kazou repeats and realleges paragraphs 1 through 252 of this Complaint as if fully set forth herein.

254.    The Barclays Defendants owed Plaintiff Kazou a duty of care as customers of Barclays. This duty of care required the Barclays Defendants to fully, completely, honestly, and accurately give full disclosure to Kazou about the Barclays Accounts and Kazou's banking relationship with the Barclays Defendants.

255.    As pleaded above, the Barclays Defendants made representations to Plaintiff Kazou about the Barclays Accounts and Kazou's banking relationship with the Barclays Defendants that were partial, incomplete, false and inaccurate.  These misrepresentations, to the extent not intentional or reckless, were made with gross negligence.

256.    Plaintiff Kazou reasonably relied upon these grossly negligent misrepresentations when opening the Barclays Accounts and when causing Kazou to use the accounts for its business.

257.    By reason of the grossly negligent misrepresentations of the Barclays Defendants, Plaintiff Kazou has been damaged in the amount of Four Hundred Twenty Six Thousand ($426,000) Dollars in ordinary damages.

TWENTY FIFTH CLAIM FOR RELIEF BY PLAINTIFF
COOPERHILL AGAINST THE BMI DEFENDANTS FOR
AIDING AND ABETTING ALL INTENTIONAL TORTIOUS CONDUCT
ALLEGED AGAINST THE SEYCHELLES AFFILIATED DEFENDANTS.

258.    Plaintiff Cooperhill repeats and realleges Paragraphs 1 through 257 above
as if fully set forth herein.

259.    The Seychelles Affiliated Defendants engaged in intentional tortious
conduct directed against Plaintiff Cooperhill as pleaded in the First, Third, Fifth, Seventh,
Ninth, Eleventh and Thirteenth Claims for Relief pleaded above.

260.    The BMI Defendants had knowledge of the Seychelles Affiliated
Defendants' plan to convert Plaintiff Cooperhill's funds for their own benefit.

261.    The BMI Defendants provided substantial assistance to the Seychelles
Affiliated Defendants by freezing the BMI Account, providing Plaintiff Cooperhill and
its representatives with false or incomplete information so as to deceive Plaintiff
Cooperhill regarding the actions of the Seychelles Affiliated Defendants, which
fraudulent statements and omissions caused Plaintiff Cooperhill to use the BMI Account
as part of Cooperhill's trading platform, and seeking information from Cooperhill for the
undisclosed purpose of conveying that information to the Seychelles Affiliated
Defendants who were seeking to steal the funds in the BMI Account.

262.    The BMI Defendants knowingly and intentionally aided and abetted the
Seychelles Affiliated Defendants in stealing Plaintiff Cooperhill's funds.  The BMI
Defendants knowingly engaged in the above-pleaded actions and omissions and aided
and abetted the Seychelles Affiliated Defendants in the commission of these acts with the
purpose of intentionally facilitating this wrongful conduct.

263.    The BMI Defendants provided substantial assistance to the Seychelles Affiliated Defendants with knowledge that the Seychelles Affiliated Defendants engaged in intentional tortious conduct directed against Cooperhill.

264.    Without the BMI Defendants' substantial assistance to the Seychelles Affiliated Defendants, the Seychelles Affiliated Defendants would not have been able to steal Plaintiff Cooperhill's funds.  The BMI Defendants aided and abetted the intentional tortious activity directed by the Seychelles Affiliated Defendants against Cooperhill.

265.    As a direct, foreseeable and proximate result of the aforepleaded aiding and abetting the intentional tortious conduct of the Seychelles Affiliated Defendants by the BMI Defendants, Plaintiff Cooperhill has been damaged in the principal amount of Ten Million Three Hundred Thousand ($10,300,000) Dollars in ordinary damages.

TWENTY SIXTH CLAIM FOR RELIEF BY PLAINTIFF
KAZOU AGAINST THE BARCLAYS DEFENDANTS FOR
AIDING AND ABETTING ALL INTENTIONAL TORTIOUS CONDUCT
<u>ALLEGED AGAINST THE SEYCHELLES AFFILIATED DEFENDANTS.</u>

266.    Plaintiff Kazou repeats and realleges Paragraphs 1 through 265 above as if fully set forth herein.

267.    The Seychelles Affiliated Defendants engaged in intentional tortious conduct directed against Plaintiff Kazou as pleaded in the Second, Fourth, Sixth, Eighth, Tenth, Twelfth and Fourteenth Claims for Relief pleaded above.

268.    The Barclays Defendants had knowledge of the Seychelles Affiliated Defendants' plan to convert Plaintiff Kazou's funds for their own benefit.

269.    The Barclays Defendants provided substantial assistance to the Seychelles Affiliated Defendants by freezing the Barclays Account, providing Plaintiff Kazou and its representatives with false or incomplete information so as to deceive Plaintiff Kazou

regarding the actions of the Seychelles Affiliated Defendants, which fraudulent statements and omissions caused Kazou to use the Barclays Account in its energy-efficiency business and seeking information from Kazou for the undisclosed purpose of conveying that information to the Seychelles Affiliated Defendants who were seeking to steal the funds in the Barclays Account.

270.     The Barclays Defendants knowingly and intentionally aided and abetted the Seychelles Affiliated Defendants in stealing Kazou's funds.  The Barclays Defendants knowingly engaged in the above-pleaded actions and omissions and aided and abetted the Seychelles Affiliated Defendants in the commission of these acts with the purpose of intentionally facilitating this wrongful conduct.

271.     The Barclays Defendants provided substantial assistance to the Seychelles Affiliated Defendants with knowledge that the Seychelles Affiliated Defendants engaged in intentional tortious conduct directed against Plaintiff Kazou.

272.     Without the Barclays Defendants' substantial assistance to the Seychelles Affiliated Defendants, the Seychelles Affiliated Defendants would not have been able to steal Plaintiff Kazou's funds.  The Barclays Defendant aided and abetted the intentional tortious activity directed by the Seychelles Affiliated Defendants against Kazou.

273.     As a direct, foreseeable and proximate result of the aforepleaded aiding and abetting the intentional tortious conduct of the Seychelles Affiliated Defendants by the Barclays Defendants, Plaintiff Kazou has been damaged in the principal amount of Four Hundred Twenty Six Thousand ($426,000) Dollars in ordinary damages.

WHEREFORE, Plaintiffs demand judgments against the defendants as follows:

A.     On the First Claim for Relief Plaintiff Cooperhill demands:

1.      Damages against the Seychelles Affiliated Defendants in the amount of Ten Million Three Hundred Thousand Dollars ($10,300,000) in ordinary damages plus interest and attorneys' fees.

B.      On the Second Claim for Relief Plaintiff Kazou demands:

1.      Damages against the Seychelles Affiliated Defendants in the amount of Four Hundred Twenty Six Thousand Dollars ($426,000) in ordinary damages.

C.      On the Third, Fifth, Eleventh and Thirteenth Claims for Relief Plaintiff Cooperhill demands:

1.      Damages against the Seychelles Affiliated Defendants, and each of them jointly and severally, in the principal amount of Ten Million Three Hundred Thousand ($10,300,000) Dollars in ordinary damages, together with all accrued interest thereupon, together with attorneys' fees incurred by Plaintiff Cooperhill.

D.      On the Fourth, Sixth, Twelfth and Fourteenth Claims for Relief Plaintiff Kazou demands:

1.      Damages against the Seychelles Affiliated Defendants, and each of them jointly and severally, in the principal amount of Four Hundred Twenty Six Thousand ($426,000) Dollars in ordinary damages, together with all accrued interest thereupon, together with attorneys' fees incurred by Plaintiff Kazou.

E.      On the Seventh and Ninth Claims for Relief Plaintiff Cooperhill demands:

1.      Damages against Seychelles in the principal amount of Ten Million Three Hundred Thousand ($10,300,000) Dollars in ordinary damages, together

with all accrued interest thereupon, together with attorneys' fees incurred by Plaintiff Cooperhill.

        F.      On the Eighth and Tenth Claims for Relief Plaintiff Kazou demands:

        1.      Damages against Seychelles in the principal amount of Four Hundred Twenty Six Thousand ($426,000) Dollars in ordinary damages, together with all accrued interest thereupon, together with attorneys' fees incurred by Plaintiff Kazou.

        G.      On the Fifteenth, Seventeenth, Nineteenth, Twenty First, Twenty Third and Twenty Fifth Claims for Relief  Plaintiff Cooperhill demands:

        Damages against the BMI Defendants, and each of them, jointly and severally, in the principal amount of Ten Million Three Hundred Thousand ($10,300,000) Dollars in ordinary damages, together with all accrued interest thereupon, together with attorneys' fees incurred by Plaintiff Cooperhill.

        H.      On the Sixteenth, Eighteenth, Twentieth, Twenty Second, Twenty Fourth and Twenty Sixth Claims for Relief  Plaintiff Kazou demands:

        1.      Damages against the Barclays Defendants, and each of them, jointly and severally, in the principal amount of Four Hundred Twenty Six Thousand ($426,000) Dollars in ordinary damages, together with all accrued interest thereupon, together with attorneys' fees incurred by Plaintiffs Kazou.

        I.      Upon all Claims for Relief:

        1.      Plaintiffs Cooperhill and Kazou demand such other and further relief as the Court may deem just and proper to award Plaintiffs complete relief.

Dated: New York, New York
February 11, 2011

HOFHEIMER GARTLIR & GROSS, LLP


By:_____

    Craig Weiner (CW 3321)
    Robert Kenney (RK 6024)
    Attorneys for Plaintiffs
    530 Fifth Avenue
    New York, New York 10036
    Tel:  (212) 818-9000